UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FRITZ WUTHRICH,

       Appellant,

   v.

AMER SPORTS WINTER & OUTDOOR COMPANY,

       Appellee.

No. C-14-0871 EMC

**ORDER AFFIRMING BANKRUPTCY COURT'S SUMMARY JUDGMENT DECISION**

    Appellant Fritz Wuthrich appeals the summary judgment decision of a bankruptcy court. The bankruptcy court held that a discharge that Mr. Wuthrich had obtained in a Chapter 7 bankruptcy proceeding did not apply to a claim asserted by Appellee Amer Sports Winter & Outdoor Company ("Amer"). Amer's claim against Mr. Wuthrich was based on a personal guaranty that Mr. Wuthrich had signed prior to filing his Chapter 7 petition.

    Having considered the parties' briefs and accompanying submissions, the Court hereby **AFFIRMS** the decision of the bankruptcy court.

## I.   FACTUAL & PROCEDURAL BACKGROUND

    During summary judgment proceedings before the bankruptcy court, the parties submitted a joint stipulation of facts. Those facts are, in relevant part, as follows.

    Mr. Wuthrich is the sole shareholder and president of a California corporation known as CIT Sports, Inc. ("CIT"). CIT operates a specialty sports shop. *See* Docket No. 21, at 9 (Stip. ¶ 2).

1    Amer, a Delaware corporation, is engaged in the sale of sporting goods and apparel. Its
2 predecessor was Atomic Ski USA, Inc. *See* Docket No. 21, at 9 (Stip. ¶¶ 1, 3).
3    On August 15, 2001, Atomic Ski and CIT entered into an agreement. *See* Docket No. 21, at
4 9 (Stip. ¶ 3). The agreement basically addressed setting up an account for CIT with Atomic Ski.
5 *See* Docket No. 21, at 5 (agreement). For example, the agreement provided that "Applicant [CIT]
6 hereby certifies that the tangible personal property purchased from Atomic Ski . . . is purchased for
7 resale [*i.e.*, to the general public]." Docket No. 21, at 5 (agreement). It also provided that Atomic
8 Ski was authorized to investigate CIT's credit history and that, if CIT was accepted as an account of
9 Atomic Ski, it would be bound by certain terms and conditions. *See* Docket No. 21, at 5
10 (agreement).
11    Mr. Wuthrich signed the CIT/Atomic Ski agreement as CIT's president. In connection with
12 the agreement, Mr. Wuthrich also signed a personal guaranty in favor of Atomic Ski, guaranteeing
13 payment of CIT's obligations to Atomic Ski. *See* Docket No. 21, at 10 (Stip. ¶ 4). The personal
14 guaranty provided: "For Value Received from Atomic Ski . . . (Seller) as inducement to Seller to sell
15 and deliver merchandise to above Applicant [CIT], the undersigned [Mr. Wuthrich], jointly and
16 severally guarantee(s) prompt and punctual payment of any account owing from Applicant to
17 Seller." Docket No. 21, at 5 (personal guaranty). The personal guaranty further provided: "This
18 contract of guaranty shall *remain in force until revoked* by the guarantor by giving 10 days written
19 notice by registered mail addressed to Seller." Docket No. 21, at 5 (personal guaranty).
20    Atomic Ski sold merchandise to CIT and was paid for the merchandise for many years
21 without incident. *See* Docket No. 21, at 10 (Stip. ¶ 5).
22    In May 2010, CIT filed a Chapter 11 bankruptcy petition. Mr. Wuthrich executed the
23 petition on behalf of CIT. *See* Docket No. 21, at 10 (Stip. ¶ 6). During the CIT bankruptcy, Atomic
24 Ski/Amer continued to sell merchandise to CIT. *See* Docket No. 21, at 10 (Stip. ¶ 9). Atomic
25 Ski/Amer was never listed as a creditor in the CIT bankruptcy, never received notice of the CIT
26 bankruptcy, and was not aware of the CIT bankruptcy. *See* Docket No. 21, at 10 (Stip. ¶ 8).
27    In July 2010, Mr. Wuthrich and his wife filed a Chapter 7 bankruptcy petition. Atomic
28 Ski/Amer was never listed as a creditor in the Wuthrich bankruptcy, never received notice of the

2

Wuthrich bankruptcy, and was not aware of the Wuthrich bankruptcy. *See* Docket No. 21, at 10 (Stip. ¶ 12).

In December 2010, the bankruptcy court issued a discharge of debtor and final decree in the Wuthrich bankruptcy. *See* Docket No. 21, at 10 (Stip. ¶¶ 10-11).

In February 2012, the bankruptcy court entered an order in the CIT bankruptcy, confirming CIT's plan of reorganization. *See* Docket No. 21, at 10 (Stip. ¶ 7).

Some time after the discharge in the Wuthrich bankruptcy, CIT, acting through Mr. Wuthrich, ordered merchandise from Atomic Ski/Amer. Atomic Ski/Amer shipped the goods to CIT but CIT failed to pay, with the outstanding invoices totaling $74,064.42. *See* Docket No. 21, at 10 (Stip. ¶¶ 13-14).

Amer filed suit against CIT in state court, based on the outstanding invoices. Subsequently, Mr. Wuthrich advised Amer of the prior CIT and Wuthrich bankruptcies. Mr. Wuthrich asserted that Amer could not enforce the personal guaranty that he had signed because of the discharge in the Wuthrich bankruptcy. *See* Docket No. 21, at 11 (Stip. ¶¶ 16-17).

Thereafter, Amer brought an action for declaratory relief with the bankruptcy court, seeking to resolve the dispute. *See* Docket No. 21, at 2 (complaint for declaratory relief). As indicated above, at summary judgment, the parties presented a joint stipulation of facts to the bankruptcy court for its consideration. At the hearing on the summary judgment motions, the bankruptcy court commented as follows:

> I can't – I can't let Mr. Wuthrich off the hook on this one. This is a gotcha. . . . This is a situation where Mr. Wuthrich had a choice. Come clean and inform Amer Sports [before ordering more merchandise on behalf of CIT] by the way I'm discharged. Even [though] that might have meant, you know, they're not going to ship to my company [CIT]. But it's a gotcha for him to be in control of the facts, or the fate, if you will, and Amer Sports to have no knowledge of anything. And we can speculate on if he had said: By the way, I'm off the hook on the guaranty, we can assume they probably wouldn't have shipped.
>
> But I think whether we call this estoppel or it – "gotcha" is not a legal term, but it's a gotcha to say: I'm not going to tell you that I've discharged my liability – and by the way, [the bankruptcy court is] not getting into the question of whether there was a contingent claim on the date of bankruptcy or not. It doesn't matter to [the bankruptcy

3

> court]. There was no debt. But maybe there was a contingent claim. . . .
>
> . . . [S]o my analysis is that Mr. Wuthrich had the ability, although it may have been not in his company's best interests, to avoid any claim of liability. And he declined either to notify Amer of the bankruptcy or to invoke the termination clause. He did neither. He said: Please ship.
>
> And certainly under an estoppel and basic-fairness principle he had an obligation to inform them that he was going to try to disclaim any liability under the guaranty or he can now claim that he needed discharge.
>
> So that's a rambling way of saying there's no way I can say that this debt was discharged and that this is a prepetition debt.

Docket No. 21, at 13-15 (bankruptcy court hearing).

Subsequently, the bankruptcy court issued its order granting Amer, and denying Mr. Wuthrich, summary judgment. *See* Docket No. 1-2, at 1 (bankruptcy court order).

## II.  **DISCUSSION**

This Court reviews the bankruptcy court's decision granting summary judgment to Amer de novo. *See In re Caneva*, 550 F.3d 755, 760 (9th Cir. 2008) (noting that the roles of the circuit and district courts "'are essentially the same in the bankruptcy appellate process'" and that the bankruptcy court's grant of summary judgment is reviewed de novo); *In re Crystal Props., LTD.*, 268 F.3d 743, 755 (9th Cir. 2001) (stating that "'the district court functions as an appellate court in reviewing a bankruptcy decision and applies the same standards of review as a federal court of appeals'").

Under the Bankruptcy Code, where there is a discharge, the debtor is discharged "from all debts that arose *before* the date of the order for relief under this chapter [11 U.S.C. § 701 *et seq.*]." 11 U.S.C. § 727(b) (emphasis added). Based on this statute, courts commonly make reference to discharge of "pre-petition" debts. As for the term "debt," it is defined by the Bankruptcy Code as "liability on a claim." *Id.* § 101(12). "Claim," in turn, means a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured,

disputed, undisputed, legal, equitable, secured or unsecured."[1] *Id.* § 101(5)(A). Thus, under the Bankruptcy Code, even a contingent claim – *i.e.*, a claim "which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event which will trigger the liability of the debtor to the alleged creditor," *Siegel v. Fed. Home Loan Mortg. Corp.*, 143 F.3d 525, 532 (9th Cir. 1998) (internal quotation marks omitted) – can be a pre-petition claim subject to discharge. The broad definition of "claim" is intended "to ensure that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case." *Siegel*, 143 F.3d at 532 (internal quotation marks and emphasis omitted).

In his papers, Mr. Wuthrich argues that Amer's claim against him for the outstanding invoices is a claim subject to discharge because he entered into the personal guaranty *before* he filed for bankruptcy – *i.e.*, it is a pre-petition claim. According to Mr. Wuthrich, the fact that the outstanding invoices are based on debt incurred by CIT and failed payments by CIT *after* he was discharged does not matter; that simply means that Amer had a *contingent* claim at the time of his bankruptcy proceedings. While Mr. Wuthrich did not identify Amer on any of his bankruptcy schedules as having a contingent claim, he contends that is immaterial because, under Ninth Circuit law, "'dischargeability is unaffected by scheduling' in a Chapter 7 no-assets, no-bar-date bankruptcy."[2] *In re Nielsen*, 383 F.3d 922, 926-27 (9th Cir. 2004) (quoting *In re Beezley*, 994 F.2d 1433, 1434 (9th Cir. 1993); explaining that "filing of a claim [by a creditor] is meaningless and worthless in a no-assets case"); *In re Mendiola*, 99 B.R. 864, 867 (N.D. Ill. 1989)[3] (noting that, "[i]n a case without assets to distribute the right to file a proof of claim is meaningless and worthless" as "'[t]he unlisted creditor is not prejudiced by the debtor's failure to list him because he would not have received a distribution anyway'").

---

[1] "[W]hen the Bankruptcy Code uses the word 'claim' – which the Code itself defines as a 'right to payment' – it is usually referring to a right to payment recognized under state law." *Travelers Cas. & Sur. Co. of Am. v. PG&E*, 549 U.S. 443, 451 (2007).

[2] There appears to be no dispute that the Wuthrich bankruptcy was a no-assets case.

[3] *Mendiola* was cited approvingly in the *Beezley* concurrence.

The Court is not persuaded by Mr. Wuthrich's arguments. As a preliminary matter, the Court notes that, although a "contingent" claim may be broadly defined, "logic dictates that the concept cannot be limitless. At some point, a right to payment becomes so contingent that it cannot fairly be deemed a right to payment at all." *In re Thomas*, No. 09-33212 HCD, 2013 Bankr. LEXIS 3675, at *13 (N.D. Ill. Apr. 30, 2013) (internal quotation marks omitted). The Ninth Circuit has confirmed as much by noting that "[n]o doubt the future is always contingent, but that does not mean that a bankrupt is discharged regarding everything he might do in the future." *Siegel*, 143 F.3d at 532.

Here, Amer's claim on the outstanding invoices was too remote to be fairly deemed a right to payment for several reasons. First, at the time of the bankruptcy proceedings, no debt had actually been incurred by CIT.

Second, there is nothing in the record to suggest that CIT made fixed or regular purchases from Amer such that Amer – or even CIT – would have reasonably expected more purchases or, even if they had expected more purchases, that the purchases would be of any ascertainable size or amount. *See Thomas*, 2013 Bankr. LEXIS 3675, at *17 (advocating application of a "fair contemplation" test to determine whether a claim is a contingent claim – *i.e.*, whether "'the possibility of the event triggering the right to payment is within the fair contemplation of the creditor at the time the petition is filed'"). In this regard, the case on which Mr. Wuthrich primarily relies, *In re Motley*, 268 B.R. 237 (C.D. Cal. 2001), is distinguishable. There, the debt of the principal obligor that had yet to be incurred was rent – something that is relatively predictable as becoming due both in terms of timing and amount. *Cf. In re Getzhoff*, 180 B.R. 572, 572-74 (9th Cir. Bankr. App. Panel 1995)[4] (involving a personal guaranty for a loan that a company obtained from a bank).

Third, the fact that CIT and Mr. Wuthrich failed to identify any future claim by Amer in their bankruptcies also supports the current claim on the outstanding invoices being too remote to fairly constitute a right to payment. *See Thomas*, 2013 Bankr. LEXIS 3675, at *13 (noting that "the debtor

---

[4] "BAP decisions cannot bind the district courts themselves. As article III courts, the district courts must always be free to decline to follow BAP decisions and to formulate their own rules within their jurisdiction." *Bank of Maui v. Estate Analysis*, 904 F.2d 470, 472 (9th Cir. 1990).

1 himself did not consider his obligation as guarantor to be a ripe pre-petition contingent debt" as he
2 did not list the company as a potential creditor).  To the extent Mr. Wuthrich suggests that the only
3 reason he did not identify a claim by Amer is because such action would have been meaningless –
4 his case being a no-assets case – the Court has its doubts as to the veracity of such a claim.  There is
5 no good reason not to have listed the Amer claim (unless it was too remote to be even a contingent
6 claim).

In any event, the failure to give Amer notice (by not listing Amer as a creditor) gives rise to a fourth reason why Amer's claim should not be treated as a pre-petition claim.  Had Mr. Wuthrich given notice of a potential claim by Amer, then Amer would have been on notice of the Wuthrich bankruptcy, and that fact clearly would have been material to Amer's decision to make future sales to CIT because the contract that Atomic Ski/Amer had with CIT included the personal guaranty by Mr. Wuthrich.[5]  Failure to afford notice to permit creditors an opportunity to protect themselves is an equitable consideration appropriate for the Court to take into account in evaluating whether Amer's claim for the outstanding invoices is a pre-petition contingent claim subject to discharge.  *See id.* at \*22 (noting that, because of the lack of notice to the company, the bankruptcy court would "weigh the debtor's right to a fresh start along with the creditor's right to due process").

Finally, it is significant that the contingency of the claim in this case did not turn on events or actions of a third party; here, it turned on Mr. Wuthrich's volitional conduct through CIT to incur liability to CIT after the bankruptcies.  In this regard, the Ninth Circuit's analysis in *Siegel* is instructive.  In *Siegel*, the plaintiff and another individual (his partner) executed two notes in which they promised to pay a mortgage company the principal sums of $840,000 and $900,000, respectively, in monthly installments.  Each note was secured by a deed of trust.  Subsequently, the mortgage company sold and assigned the notes and deeds of trust to Freddie Mac.  *See Siegel*, 143 F.3d at 527.

---

[5] The Court acknowledges that Mr. Wuthrich did not stipulate to Amer's having relied on the ongoing enforceability of the personal guaranty in making sales to CIT after the bankruptcy proceedings had concluded.  *See* Docket No. 21, at 11 (Stip. ¶ 15).  But Mr. Wuthrich's refusal to stipulate does not detract from the fact that the personal guaranty was clearly a material part of the contract between Atomic Ski/Amer and CIT.

7

1 In December 1992, the plaintiff and his partner defaulted on one note, after which Freddie 2 Mac foreclosed on the property. Subsequently, the plaintiff declared bankruptcy, and the plaintiff 3 and his partner defaulted on the second note. *See id.* at 528. Freddie Mac then filed two proofs of 4 claim against the plaintiff in the bankruptcy proceeding. Neither the plaintiff nor the trustee 5 objected to the proofs of claim. In March 1994, the bankruptcy court allowed Freddie Mac to 6 proceed with foreclosure on the second property. *See id.* In April 1994, the plaintiff brought a tort 7 and breach-of-contract action against Freddie Mac regarding the foreclosures. *See id.* at 527-28. 8 Subsequently, the plaintiff was discharged from bankruptcy, and, in August 1994, Freddie Mac 9 foreclosed on the second property. *See id.* at 528.

Thereafter, in the lawsuit that the plaintiff had filed, Freddie Mac moved for summary judgment, arguing that the action was barred by the res judicata effect of the bankruptcy proceeding. The district court granted the motion, and Freddie Mac then moved to recover attorney's fees incurred in defending against the plaintiff's claims. The district court granted that motion as well. *See id.*

On appeal, the Ninth Circuit affirmed. Of particular relevance here was the attorney's fee decision. The court noted that, even though "Freddie Mac's rights under the notes and deeds of trust had been decided in the bankruptcy court and Freddie Mac's claims had been discharged there, [the plaintiff] chose to sue on the theory that Freddie Mac had breached the deeds of trust's promises," and, "[u]nfortunately for him, the deeds of trust provide for attorney's fees." *Id.* at 531. The court then concluded that the fee provision was not affected by the bankruptcy proceedings, explaining as follows:

> In the first place, the mere fact that [the plaintiff] obtained a bankruptcy discharge did not eliminate the provision. That is, it cannot be said that the whole contract merged into that judgment. As the Supreme Court pointed out in *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991), a discharge in bankruptcy "extinguishes *only* 'the personal liability of the debtor.'" Thus, the Court found that a "creditor's right to foreclose on the mortgage survives or passes through bankruptcy." Similarly, . . . a discharge in bankruptcy does not end a party's obligation, but merely prevents one method of collection. Thus, [the plaintiff's] discharge in bankruptcy did not extinguish the contractual attorney's fee provision. The provision itself may have fallen dormant, but it was reviviscible.

8

*Id.* (emphasis in original).

The Ninth Circuit acknowledged that the bankruptcy discharge did get rid of all of the plaintiff's pre-petition debts but the question was "when the attorney's fee debt arose" – *i.e.*, pre-petition or post-discharge. *Id.* at 532. This issue, of course, was complicated by the fact that the contracts containing the attorney fee provision were executed pre-petition but the plaintiff's acts which gave rise to the fee award occurred post-discharge. *See id.* According to the Ninth Circuit, if the attorney fee's claim were a contingent claim, then it would be a pre-petition claim subject to discharge. But the attorney's fee claim was not such a claim.

The Ninth Circuit explained that, although "[a]ny doubts regarding the dischargeability of a claim 'should be resolved in favor of finding that a contingent claim existed,'" it should not read that principle "in an unreflective way." *Id.* "No doubt the future is always contingent, but that does not mean that a bankrupt is discharged regarding everything he might do in the future." *Id.* The court then noted that, in other cases, it had focused on when the contractual agreement had been executed and not when the contingency took place, but those cases involved

> situations where the possibility of a claim against the debtor was fixed and entirely out of his hands before he entered bankruptcy. In other words, he had a possible liability, and whether actual liability would attach to him was contingent upon what others might do. Were he not discharged, that very real threat would stay with him and remain a millstone around his economic neck as he attempted a fresh start. The very purpose of bankruptcy proceedings would be cut away. Indeed, a person with enormous possible indemnification liability could never effectively obtain a fresh start. That is decidedly not a proper result, but it is also not the case at hand.
>
> This is a case where the debtor . . . had been freed from the untoward effects of contracts he had entered into. Freddie Mac could not pursue him further, nor could anyone else. He, however, chose to return to the fray and to use the contract as a weapon. It is perfectly just, and within the purposes of bankruptcy, to allow the same weapon to be used against him.

*Id.* at 533.

In the case at bar, the possibility of a claim by Amer against Mr. Wuthrich was entirely within *his* control, and he made the choice to have CIT continue to engage with Amer post-discharge without informing Amer about the bankruptcy proceedings. Moreover, Mr. Wuthrich had additional control here as he had the right to revoke his personal guaranty, *see* Docket No. 21, at 5 (personal

9

guaranty) (providing that "[t]his contract of guaranty shall remain in force until revoked by the guarantor by giving 10 days written notice"), but he never did. *See In re Weeks*, 400 B.R. 117, 124 (W.D. Mich. 2009) (in concluding that yet-to-be-incurred debts were not a contingent claim but rather at most were an expectancy, taking note that "the debtor clearly had the contractual right under all of his pre-petition guaranties to at any time avoid that future exposure by revoking those guaranties.).

Taking into account all of the above, the Court concludes that Amer's claim for the outstanding invoices does not constitute a pre-petition contingent claim subject to the bankruptcy discharge.

### III. CONCLUSION

Accordingly, the decision of the bankruptcy court is affirmed.

The Clerk of the Court is instructed to enter judgment in accordance with the above and close the file in this case.

IT IS SO ORDERED.

Dated: April 1, 2015

_____
EDWARD M. CHEN
United States District Judge